UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| GARY T. MONROE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-04107-SLD-JEH |
| | ) | |
| CAPSTONE LOGISTICS, LLC and LMS | ) | |
| INTELLIBOUND, INC. n/k/a LMS | ) | |
| INTELLIBOUND, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

Before the Court is Defendants Capstone Logistics, LLC ("Capstone Logistics") and

LMS Intellibound, Inc. n/k/a LMS Intellibound, LLC's ("LMS") (collectively, "Capstone")

Motion for Summary Judgment, ECF No. 22.  For the following reasons, the motion is

GRANTED IN PART and DENIED IN PART.

**BACKGROUND[1]**

I.      **Position and Job Responsibilities**

Capstone is a logistics company that provides warehouse services.  Plaintiff Gary T.

Monroe, who is African American, was employed by Capstone from June 3, 2007, when

Capstone hired him as a Lead to work in the Rock Island, Illinois warehouse facility of

Capstone's business partner, Performance Food Group ("PFG"), until January 25, 2019.  At

---

[1] At summary judgment, a court must "constru[e] the record in the light most favorable to the nonmovant."  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Unless otherwise noted, the factual background of this case is drawn from Capstone's statement of undisputed material facts, Defs.' Mem. Supp. Mot. Summ. J. 2–8, ECF No. 23; Plaintiff Gary T. Monroe's statement of disputed material facts and additional material facts, Pl.'s Mem. Supp. Resistance Mot. Summ. J. 2–9, ECF No. 24-1; Capstone's reply to Monroe's additional material facts, Defs.' Reply 2–24, ECF No. 25; and exhibits to the filings.

various times during the course of his employment, he also acted as the Site Manager of the PFG facility, a supervisory position directly above Lead.

Capstone associates who were assigned to the PFG warehouse often worked as unloaders. In that position, they were responsible for unloading cargo from trucks that arrived at the facility. As Lead, Monroe assigned loads and backhaul to associates, directed the truck drivers to the appropriate doors, and took care of paperwork and bills of lading.  Monroe performed some unloading work as well.

Because of his leadership position, he was subject to different standards than were other Capstone associates—he was to act as a role model and to "lead by example."  Monroe Dep. 113:25–114:9, Defs.' Mot. Summ. J. Ex. 1, ECF No. 22-2.

## II.      Relevant Policies and Complaint Mechanisms

After being hired in 2007, Monroe attended a five-day training session.  At this session, he received a copy of the Associate Handbook; during his employment, he was provided with updated versions of the Handbook when they became available.  The Handbook includes Capstone's Equal Employment Opportunity policy and its Code of Ethics policy, which directs team members to report workplace issues to the Speak Up Hotline.  The Handbook also contains a Workplace Violence Policy, which prohibits "actions against persons or property that is [sic] sufficiently severe, offensive or intimidating that it [sic] disturbs, interferes or prevents normal work functions and activities and/ or creates an intimidating, hostile, or offensive work environment."  Associate Handbook 26, Defs.' Mot. Summ. J. Ex. 5, ECF No. 22-6.  Monroe signed a form acknowledging that he had received the Handbook and understood Capstone's policies.  He was aware that he could raise any concerns to the Speak Up Hotline.

2

Capstone's Harassment and Discrimination policy instructs team members to report workplace issues to management or Human Resources.  Workplace Rules, which were applicable to all Capstone associates, were posted at Monroe's worksite.  Capstone also maintained an Operation Excellence Manager's Guide, which provides that leadership should treat their associates fairly and "[s]how the [business] partner that [they] value [their] team."  Operational Excellence Manager's Guide 32, Defs.' Mot. Summ. J. Ex. 8, ECF No. 22-9.  The Guide applied to Monroe in his role as Lead.

### III.    Monroe's Complaints and Altercation with a Capstone Associate

In 2018, Monroe and then-Site Manager Doug Hill learned of the existence of graffiti using a racial epithet on the wall of the bathroom at the PFG facility.  Monroe reported the graffiti to Hank Watson, who at the time was Director of Operations over the site.  Hill and Watson both addressed the issue with the Capstone associates at the facility.  Monroe was satisfied with how the incident was handled and believed it was addressed in a timely fashion. While Capstone never discovered the identity of the person or persons who wrote the epithet on the wall, Monroe was convinced that Capstone associates Alfonso Gomez and Javier[2] Gomez were responsible.

In October 2018, Monroe became suspicious that Alfonso and Javier were using drugs on site.  He did not address this directly with the two men but instead reported his suspicions to Hill, leaving it to him to handle.

On January 23, 2019, Monroe reported to new Site Manager John Klopp that he believed that Alfonso and Javier were under the influence of cannabis while at work.  Klopp informed him that he would address the issue with the men.  Monroe then reported the issue to Watson,

---

[2] While different spellings of "Javier" are used throughout the briefing and the exhibits, the Court will use the spelling that appears in Capstone's briefing.

3

although Watson had by that time been replaced as Director of Operations by Joseph Cline.
Watson stated that Klopp would need to handle the issue.  Before the end of the shift, Monroe
also told Bruce Ortery, a supervisor for PFG, that there were "two workers out there that
potentially were under the influence, and if there was any property damage or they hurt
themselves or hit one of their workers while they were operating heavy equipment, that [he]
made it known that [he] told someone, that it wouldn't fall back on [him]."  Monroe Dep. 79:6–
15.  Monroe did not speak to Cline or Human Resources before approaching Ortery, nor did he
call the Speak Up Hotline, the police, or the Occupational Safety and Health Administration
("OSHA") to report the suspected drug use.

That same day, Klopp informed Monroe that two trucks needed to be unloaded, and
Monroe in turn informed a group of unloaders, which included Alfonso and Javier, of the task.
Alfonso, who was upset that he would have to stay late, "exploded" and began loudly using
explicit language.  *Id.* at 123:16–23.  Monroe testified that he told Alfonso that—as they were in
an area with PFG officials—Alfonso needed to "knock that tone off" and that they "c[ouldn't]
conduct [them]selves like this" and "need[ed] to go out there and get to work."  *Id*. at 123:24–
124:7.  Monroe then went back into his office, and Klopp came in to talk to him.  According to
Monroe, Klopp said to him, "we can't have that type of commotion going to [sic] down here."
*Id*. at 125:23–25.  Monroe responded that Klopp had been in the other room and "heard the
whole conversation"—he knew that "Alfonso got loud and got belligerent."  *Id*. at 125:25–126:4.

## IV.    Termination

On January 24, 2019, Klopp sent an email to Cline, Watson, and Justin Lebel, another
member of management, detailing his account of the previous day.  The email stated:

Wednesday, 1/23/19 I overheard a verbal confrontation between Gary Monroe, Lead, and Alfonso Gomez, Warehouse Associate. I do not know how it started or exactly what was said, but I immediately said it needed to stop, which it did.

I later talked to Gary about the incident. I told him that, as a Lead, he needed to not be involved in such conduct. He told me that (not direct quote) "If Alfonso wants to get all gangster with me and he thinks I'm going to be afraid of him, he's wrong. I've got stuff on him and I'll take care of his ass."

I reminded him that Alfonso was one of only three that showed up that day on time (we had a snowstorm). He said, "I don't care he . . ." and proceeded to talk about several things that had happened in the past that he was still holding against Alfonso.

Today, 1/24/19, I was called into Marc Wyle's office (our partner). He was there with the PFG Maintenance Supervisor Bruce O[r]tery. They expressed concerns that Gary had gone to Bruce saying that he smelled marijuana on Alfonso when he came in to work. [Bruce] said that [Monroe] had told [him] "Alfonso came in yesterday smelling like marijuana and (I) didn't do anything." Gary told me he was referring to an incident that occurred while Doug Hills was Site Manager that was unresolved. I had been working with Alfonso immediately prior to going to Marc's office, and I had not notice [sic] any marijuana odor. Marc Wyle and Todd (not sure last name) later came to me and said they had just talked to Alfonso and they also did not notice a marijuana odor.

Klopp Jan. 24, 2019 Email, Defs.' Mot. Summ. J. Ex. 16, ECF No. 22-19. Cline then called his

supervisor, Garrett Elrod, Vice President of Operations for Capstone, to discuss the incident.

Cline also forwarded Klopp's email to Elrod and Patrice Boyd, Capstone's human resources

coordinator, stating that they had decided to fire Monroe. The next day, January 25, 2019, Cline

and Klopp carried out the termination.

Monroe contested his discharge. He spoke with Elrod and wrote a letter to Steve Taylor,

Capstone's Chief Executive Officer, outlining his concerns about his termination.

## V.    Procedural History

Monroe filed suit against Capstone in Illinois state court on March 31, 2020, bringing

claims for retaliatory discharge under Illinois law (Count I) and race discrimination in

employment in violation of 42 U.S.C. § 1981 (Count II). Compl. 3–6, Not. Removal Ex. A, ECF

No. 1-1 at 2–7.  The case was removed to the Central District of Illinois on May 1, 2020.  Not.

Removal, ECF No. 1.[3]  Capstone now moves for summary judgment on all of Monroe's claims.

Defs.' Mot. Summ. J. 1.

## DISCUSSION

### I.     Legal Standard

Summary judgment is warranted when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Where one party has properly moved for summary judgment, the nonmoving

party must respond "by identifying specific, admissible evidence showing that there is a genuine

dispute of material fact for trial."  *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).

"The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be

insufficient; there must be evidence on which the jury could reasonably find for the

[nonmovant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Parties may not

merely refer to their own pleadings, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), but must

instead "cit[e] to particular parts of materials in the record, including depositions, documents,

[and] . . . affidavits or declarations" or show "that the materials cited do not establish the absence

or presence of a genuine dispute," Fed R. Civ. P. 56(c)(1).[4]  The court is to "constru[e] the record

in the light most favorable to the nonmovant," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir.

2003), "resolving all factual disputes and drawing all reasonable inferences in favor of [the

nonmovant]," *Grant*, 870 F.3d at 568.  However, the nonmovant "is not entitled to the benefit of

---

[3] The Court has jurisdiction over this suit on the basis of diversity.  *See* Not. Removal 1–5 (reasonably alleging that Monroe is a citizen of a different state than both Capstone entities and that the amount in controversy exceeds $75,000).  The Court could also exercise federal question jurisdiction over Count II and supplemental jurisdiction over Count I.  *See id*. at 1, 5.

[4] "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

inferences that are supported by only speculation or conjecture." *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (quotation marks omitted).

## II.    Analysis

Plaintiff brings two claims for relief in his complaint.  In Count I, he brings an Illinois retaliatory discharge claim, alleging that he was terminated in retaliation for bringing to PFG's attention suspected illegal drug use by certain Capstone associates.  Compl. 3–4.  In Count II, he claims that his termination constitutes race discrimination in violation of 42 U.S.C. § 1981.  *Id.* at 5–6.  Capstone asserts that it is entitled to summary judgment on both claims.  Defs.' Mot. Summ. J. 1–2.  The Court turns first to the race discrimination claim.

### a.  Race Discrimination

Count II's race discrimination claim is brought under 42 U.S.C. § 1981, Compl. 5–6, which prohibits discrimination on the basis of race in the making and forming of contracts, *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013); *see* 42 U.S.C. § 1981(a) ("All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . .").  "Employment suffices as a contractual relationship under [§] 1981." *James v. Get Fresh Produce, Inc*., No. 18 C 4788, 2018 WL 6199003, at *7 (N.D. Ill. Nov. 28, 2018).

When evaluating a § 1981 claim of employment discrimination at summary judgment, a district court must determine "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc*., 834 F.3d 760, 765 (7th Cir. 2016).[5]  A plaintiff may cite to direct or

_____

[5] In the Seventh Circuit, courts "generally apply the same standards to Title VII [of the Civil Rights Act of 1964] and [§] 1981 race discrimination claims at the summary judgment stage."  *Smiley*, 714 F.3d at 1002; *see also James*, 2018 WL 6199003, at *8 ("[T]he substantive standards and methods of proof that apply to claims of racial

circumstantial evidence of discrimination to show causation; examples of circumstantial

evidence that may "support an inference of intentional discrimination [include] ambiguous or

suggestive comments or conduct; better treatment of people similarly situated but for the

protected characteristic; and dishonest employer justifications for disparate treatment."  *Joll v.*

*Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020).  "Evidence must be considered as a

whole, rather than asking whether any particular piece of evidence proves the case by itself . . . ."

*Ortiz*, 834 F.3d at 765.  "The ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Tex.*

*Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

One method a plaintiff may use for "organizing, presenting, and assessing circumstantial

evidence" in discrimination cases is the burden-shifting framework created by *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), under which

> the plaintiff has the initial burden of establishing that (1) she is a member of a
> protected class, (2) she performed reasonably on the job in accord with her
> employer['s] legitimate expectations, (3) despite her reasonable performance, she
> was subjected to an adverse employment action, and (4) similarly situated
> employees outside of her protected class were treated more favorably by the
> employer;

the burden then shifts to the employer to "articulate a legitimate, nondiscriminatory reason for

the adverse employment action, at which point the burden shifts back to the plaintiff to submit

evidence that the employer's explanation is pretextual."  *David v. Bd. of Trs. of Cmty. Coll. Dist.*

*No. 508*, 846 F.3d 216, 224–25 (7th Cir. 2017) (alteration in original) (quotation marks

omitted).[6]

---

discrimination and retaliation under Title VII also apply to claims under § 1981.").  Thus, the Court cites to § 1981
and Title VII cases interchangeably.
[6] Although the Seventh Circuit previously distinguished "direct" from "indirect" evidence, *Andrews v. CBOCS W.,*
*Inc.*, 743 F.3d 230, 234 (7th Cir. 2014), it subsequently abandoned this practice, *Ortiz*, 834 F.3d at 763–66.  While
acknowledging that employment discrimination cases are rarely straightforward, the Seventh Circuit found that

Capstone contends that it is entitled to summary judgment on Monroe's claim that his termination constitutes race discrimination, arguing that he has neither satisfied his burden of establishing a *prima facie* case under the *McDonnell Douglas* framework[7] nor shown that there is sufficient evidence in the record as a whole to demonstrate discrimination.  Defs.' Mem. Supp. Mot. Summ. J. 9–10, ECF No. 23.  The Court will examine whether Monroe has satisfied his burden under either method.

### i.   *McDonnell Douglas* Burden-Shifting Framework

Two of the four elements necessary to establish a *prima facie* case under the *McDonnell Douglas* framework are not in dispute: Monroe is a member of a protected class, and he was subjected to an adverse employment action when he was terminated.  To fulfill his initial burden, he must also show that he was meeting Capstone's legitimate expectations at the time he was fired and that Capstone treated similarly situated employees who were not African American more favorably.  *See David*, 846 F.3d at 225.[8]

The Court turns first to the "similarly situated" element.  "[W]hether employees are similarly situated is a flexible, common-sense, and factual inquiry."  *Id.* at 225 (quotation marks omitted).  The court should consider such factors as "whether the employees (i) held the same

---

attempting to funnel the evidence in these often factually complex cases into categories was likely to complicate matters.  *Id.* at 765.  As such, it instructed district courts to "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards."  *Id.*  However, the Seventh Circuit continues to recognize the *McDonnell Douglas* burden-shifting framework as one method for presenting circumstantial evidence. *Id.* at 766; *David*, 846 F.3d at 224.

[7] While Capstone does not explicitly cite *McDonnell Douglas* in its memorandum, it does refer to the burden-shifting method established in that case.  Defs.' Mem. Supp. Mot. Summ. J. 9.

[8] Monroe disagrees with Capstone's articulation of what is required to establish a *prima facie* case of race discrimination, arguing that "the Seventh Circuit has noted that [in certain cases] expectations themselves maybe [sic] tainted by discrimination so that [the] plaintiff is only required to show that he was singled out for worse treatment than similarly situated employees," eschewing the need to show that the employee was meeting his employer's legitimate expectations.  Pl.'s Mem. Supp. Resistance Mot. Summ. J. 10 (citing *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007); *Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006)).  Because the Court finds that Monroe has not identified any suitable comparators, it does not reach the question of whether Monroe was meeting Capstone's legitimate expectations and thus does not need to address Monroe's argument.

job description, (ii) were subject to the same standards, (iii) were subordinate to the same

supervisor, and (iv) had comparable experience, education, and other qualifications—provided

the employer considered these latter factors in making the personnel decision." *Id*. at 226

(quotation marks omitted). If sufficient information is not provided, the court cannot find

employees to be comparable. *See Anders v. Waste Mgmt. of Wis.*, 463 F.3d 670, 676–77 (7th

Cir. 2006) (affirming a grant of summary judgment on a race discrimination claim where, while

the employee claimed that "there were four white, comparable . . . employees who engaged in

analogous acts of aggression, the record [wa]s devoid of any information as to the specifics of

their actions, their supervisor, or any mitigating circumstances"). The burden of establishing that

an employee was similarly situated—through citations to evidence—belongs to Monroe. *See*

*David*, 846 F.3d at 225.

     Monroe suggests that Alfonso and another unloader, Miles Clifton, were similarly

situated non-African American employees who were treated differently in that they "violat[ed]

workplace rules prohibiting threats of violence toward co-workers" but "received no discipline."[9]

Pl.'s Mem. Supp. Resistance Summ. J. 10–11, ECF No. 24-1. This comparison falls at the first

hurdle. While Alfonso and Clifton were unloaders, *see* Monroe Dep. 117:7–15; *id*. at 68:5–7,

Monroe was a Lead who oversaw the other workers in the warehouse; for example, he assigned

the unloaders to different loads, *id*. at 99:14–16, 104:20–22; *see also* Lead Warehouse Associate

Job Summary, Defs.' Mot. Summ. J. Ex. 9, ECF No. 22-10. Although Monroe did unload trucks

as well, Monroe Dep. 99:17–19, his leadership position set him apart from Alfonso and

Clifton—Monroe admits that, as Lead, he was subject to different standards than the unloaders,

---

[9] At this stage, the Court takes no position on whether Monroe, in fact, did threaten Alfonso or whether that was the true reason for his termination. It merely follows Monroe's lead as to the relevant conduct in evaluating Alfonso and Clifton as potential comparators.

*see id.* at 113:25–114:9 ("In my leadership role, I was to be like a role model to the workers, and—and being in leadership, I was to lead by example.").  Thus, Monroe did not "h[o]ld the same job description" and was not "subject to the same standards" as the two men, defeating his argument that they are suitable comparators.  *See David*, 846 F.3d at 226.  Monroe's additional attempt to show that he was treated differently than comparable employees by pointing to Capstone's failure to discipline Alfonso and Javier for their marijuana use fails for the same reason, *see* Pl.'s Mem. Supp. Resistance Mot. Summ. J. 13–14: as they were both unloaders, Monroe Dep. 117:7–15, they are not adequate comparators for Monroe.[10]

Monroe contends that "where workers in misconduct cases are punished more harshly than for example a supervisor for the same misconduct[,] the general rule that employees of different ranks usually make poor comparators does not apply"—instead of "job description and duties," the Court should look to "alleged misconduct, performance standards[, and] . . . disciplining supervisor" to determine whether a comparator is adequate.  Pl.'s Mem. Supp. Resistance Mot. Summ. J. 13 (citing *Coleman v. Donahoe*, 667 F.3d 835, 848–49 (7th Cir. 2012) (finding that two employees with different job titles and duties than the plaintiff could nonetheless be considered comparators because they "worked at the same job site as [the plaintiff], were subject to the same standards of conduct, violated the same rule, and were disciplined by the same supervisor")).  As noted above, Monroe was, as Lead, subject to different performance standards than Clifton and Alfonso, who were unloaders.  And a proposed comparison to Alfonso and Javier for their marijuana use does not involve the same kind of

---

[10] Monroe further suggests in his deposition and in his response to Capstone's statement of undisputed facts that Klopp is an adequate comparator.  *See* Monroe Dep. 195:18–25 ("I feel the things that John Klopp, that I witnessed in his tenure, he probably should have been terminated for, especially not administering drug tests—prescreen drug tests.  He didn't get fired."); Pl.'s Mem. Supp. Resistance Mot. Summ. J. 4.  Klopp, who was Site Manager, occupied a different position than Monroe and was, in fact, Monroe's supervisor.  Monroe Dep. 66:20–21; Lead Warehouse Associate Job Summary 1 (noting that Leads—like Monroe—reported to the Site Manager).  This makes him unsuitable as a comparator for Monroe.  *See David*, 846 F.3d at 226.

misconduct.[11]  Thus, this argument does not salvage Monroe's attempt to establish a *prima facie* case of race discrimination.

Monroe has not satisfied his burden under the *McDonnell Douglas* framework.  Because Monroe has not identified any similarly situated non-African American employees who were treated more favorably, the Court does not find it necessary to determine whether Monroe was meeting Capstone's legitimate expectations.

### ii.  Evidence Considered as a Whole

While Monroe has not established a genuine issue of fact as to whether his termination was discriminatory under the *McDonnell Douglas* framework, his claim may nonetheless survive summary judgment if the evidence, considered as a whole, "would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge."  *See Ortiz*, 834 F.3d at 765. Evidence that race played any role in Monroe's termination is completely absent.  He argues that he has provided sufficient evidence that his termination was discriminatory by showing that similarly situated non-African American employees were treated differently, *see* Pl.'s Mem. Supp. Resistance Mot. Summ. J. 10–15, but, as discussed above, the Court does not find that Monroe has identified any adequate comparators.  Monroe further contends that the disparate treatment of comparable employees creates a genuine dispute as to whether Capstone's reason for terminating him was pretextual, *see id*. at 14–15, but the Court dismisses this argument for the same reason.  Monroe also asserts that he has demonstrated that there is a material dispute of fact as to whether the account of his altercation with Alfonso in Klopp's email accurately stated what happened and that therefore it is for the jury to decide if Cline or Elrod could have reasonably believed Klopp's version of the incident.  *Id*. at 14.  However, he does not connect

---

[11] Monroe states that Klopp's misconduct was failing to administer drug tests, which differs from any misconduct of which Monroe was accused.  Thus, any attempt to use Klopp as a comparator under this argument similarly fails.

this to race in any way.  Monroe acknowledges that Klopp never mentioned or discussed his race

with him, Monroe Dep. 196:22–24, and cites to no evidence that Cline or Elrod made racially

related statements.

Indeed, the only fact presented by either party concerning race is the appearance of the

graffiti containing a racial epithet on the wall of the bathroom at the PFG facility.  *See* Defs.'

Mem. Supp. Mot. Summ. J. 5.  But Monroe believed that the racial epithet was written by

Alfonso and Javier, Monroe Dep. 57:11–17, both of whom were unloaders and would have

played no role in the decision to terminate Monroe.  Moreover, Monroe was satisfied with the

way his superiors handled the incident, *id.* at 62:5–9, and does not argue that there was a

connection between the graffiti and his termination.  "Standing alone, biased comments do not

establish discriminatory motive unless they were by the decision maker and can be connected to

the decision." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013); *see Hemsworth v.

Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) ("[I]solated comments that are no more

than stray remarks in the workplace are insufficient to establish that a particular decision was

motivated by discriminatory animus." (alteration in original) (quotation marks omitted)),

*overruled on other grounds by Ortiz*, 834 F.3d 760.  The Court cannot infer from the mere

appearance of this graffiti that Capstone was racially motivated to terminate Monroe.

All of the evidence, considered cumulatively, would not permit a reasonable factfinder to

conclude that Monroe was terminated because of his race.  *Cf. Ortiz*, 834 F.3d at 766 (finding

that there was a genuine dispute as to whether an employee was terminated because of his

Mexican ethnicity because there was evidence that the employee's managers repeatedly directed

ethnic slurs at him, he was allegedly fired for engaging in a practice that was common at the

company, and there was no express policy that forbid the practice).  The Court thus grants

13

summary judgment in Capstone's favor on Monroe's claim that his termination constitutes race discrimination.

### b.  Retaliatory Discharge

In Count I, Monroe alleges that his termination—which he claims occurred because he reported suspected illegal drug use to PFG—constitutes retaliatory discharge, a tort recognized by the Illinois courts.  Compl. 3–4.  Capstone asserts that it is entitled to summary judgment on this claim "because the undisputed facts show that . . . . Capstone terminated Monroe due to the altercation with and threats against [Alfonso]" and because even if the drug reporting were the basis for dismissal, "such a discharge would not be in contravention of any clearly mandated public policy."  Defs.' Mem. Supp. Mot. Summ. J. 13–15.  In response, Monroe argues that there is a factual dispute as to the true reason for his discharge, and thus summary judgment is not appropriate.  Pl.'s Mem. Supp. Resistance Mot. Summ. J. 15–16.

The tort of retaliatory discharge is "an exception to the general rule that an at-will employment is terminable at any time for any or no cause."  *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 878 (Ill. 1981) (quotation marks omitted).  For an Illinois retaliatory discharge claim to survive summary judgment, the plaintiff "must have offered sufficient evidence for a jury to find that (1) the employer discharged the employee (2) in retaliation for the employee's protected activities, and (3) that the discharge was in contravention of a clearly mandated public policy."  *Reid v. Neighborhood Assistance Corp. of Am.*, 749 F.3d 581, 586 (7th Cir. 2014).  As there is no dispute that Monroe was discharged by Capstone, Defs.' Mem. Supp. Mot. Summ. J. 7; Pl.'s Mem. Supp. Resistance Mot. Summ. J. 3–4, the Court will focus on the latter two elements, turning first to the question of whether a termination resulting from the reporting of suspected illegal drug use to a third-party client would violate a clear mandate of public policy.

14

### i.   Public Policy

The Illinois Supreme Court has stated that "public policy concerns what is right and just and what affects the citizens of the State collectively."  *Palmateer*, 421 N.E.2d at 878.  Illinois courts have found that public policy is violated for the purposes of the tort of retaliatory discharge in only two circumstances: first, when an employee files a worker's compensation claim and is discharged as a result; and second, when an employee is terminated for reporting illegal or improper conduct.  *Michael v. Precision All. Grp., LLC*, 21 N.E.3d 1183, 1188 (Ill. 2014); *see Palmateer*, 421 N.E.2d at 879 (declaring that "[t]here is no public policy more basic, nothing more implicit in the concept of ordered liberty than the enforcement of a State's criminal code" (citation omitted)); *see also Lambert v. City of Lake Forest*, 542 N.E.2d 1216, 1218 (Ill. App. Ct. 1989) (noting that the Illinois Supreme Court "has expressed a narrow interpretation of the tort of retaliatory discharge, and [it] does not support the expansion of this tort").  As no worker's compensation claim is involved, the first category is not relevant here.  The Court will thus consider whether Monroe has shown that his actions support a claim of retaliatory discharge under the second category.

Termination for reporting a fellow employee's suspected illegal drug use has been held to constitute a violation of public policy.  *See Robinson v. Alter Barge Line, Inc*., 513 F.3d 668, 670–71 (7th Cir. 2008) (noting that the plaintiff's allegations that he was fired for complaining to management that fellow crew members were using illegal drugs fell precisely within the exception to at-will employment carved out by retaliatory discharge cases for terminations resulting from reporting dangerous or illegal activities at work); *Lemieux v. Consol. Freightways Inc*., No. 97 C 5606, 1997 WL 652313, at *2 (N.D. Ill. Oct. 15, 1997) (finding that allegations that an employee was discharged for "urging his employer to protect the health and safety of its

employees by investigating allegations of illegal drug use against a co-worker . . . . plainly state a claim for retaliatory discharge based on the clear public policy mandate favoring exposure of crime, and the investigation and prosecution of criminal offenses"). It is undisputed that Monroe reported the suspected marijuana use on January 23, 2019,[12] Defs.' Mem. Supp. Mot. Summ. J. 5–6; Pl.'s Mem. Supp. Resistance Mot. Summ. J. 3; marijuana use was not legalized in Illinois until January 1, 2020, *see* 410 ILCS 705/10-5. Moreover, Capstone strictly prohibited associates from reporting to work under the influence of any unlawful drugs (and marijuana, regardless of its legalization status), *see* Associate Handbook 23–25, as this would pose a safety hazard, *see id*.; *see* Elrod Dep. 55:3–7, Defs.' Mot. Summ. J. Ex. 17, ECF No. 22-20 (testifying that "[h]aving an associate under the influence of marijuana while riding a forklift would be a safety issue for both Capstone and [PFG]"); Cline Dep. 19:23–20:11, Defs.' Mot. Summ. J. Ex. 12, ECF Nos. 22-13–22-15 (acknowledging that it would be a safety issue to have an employee operating heavy equipment while under the influence of marijuana). Thus, it would seem that public policy is implicated here.

Capstone disputes that Monroe's actions fall within this established category for retaliatory discharge cases, arguing that a hypothetical termination based on such activity would have "involved only private interests" and therefore not have violated public policy. Defs.' Mem. Supp. Mot. Summ. J. 15. It points to two pieces of evidence in support. First, because

---

[12] The Court notes that it does not matter that the drug use was never verified; courts have found that as long as an employee had a good-faith belief that illegal conduct had taken place, a termination for reporting such conduct may support a claim of retaliatory discharge. *See Palmateer*, 421 N.E.2d at 880 (declaring that "[p]ersons *acting in good faith who have probable cause to believe* crimes have been committed should not be deterred from reporting them by the fear of unfounded suits by those accused" (emphasis added)); *Johnson v. World Color Press, Inc*., 498 N.E.2d 575, 578 (Ill. App. Ct. 1986) ("[A] plaintiff attempting to state a cause of action for retaliatory discharge after being fired for reporting possible illegal activity need not allege or prove conclusively the law has been violated in order to state a cause of action."); *Tanzer v. Art Inst. of Chi.*, No. 02 C 8115, 2003 WL 21788850, at *3 (N.D. Ill. Aug. 1, 2003) ("For purposes of Illinois law, all that matters is that when [the employee] reported the conduct to her supervisors, she *reasonably* believed they were engaging in an unlawful or illegal act." (emphasis in original)). Capstone does not appear to argue that Monroe's suspected drug use report was made in bad faith.

Monroe "admits he made the report to [PFG] so that any incident 'wouldn't fall back on [him],'" Capstone contends that Monroe "has conceded that the matter did not involve issues of public policy but, rather, concerns only private interests." *Id.* (second alteration in original) (quoting Monroe Dep. 79:5–15). This argument is a nonstarter. Capstone has pointed the Court to no case law establishing that an employee's motive in reporting suspected illegal conduct is relevant to the retaliatory discharge analysis, nor has the Court found the motive for disclosure to be a factor in any of the cases discussing public policy.

Second, Capstone argues that this case involves only private interests because "Monroe admits that he did not report the issue to the authorities, such as the police or OSHA, nor did he escalate the issue of any criminal activity to the Director of Operations over the Rock Island site, Mr. Cline; to Capstone's HR department; or to the 'Speak Up' hotline, all of which were available to him." *Id.* at 14–15. It further argues in its reply that even if reporting a suspected crime to one's supervisor would suffice, Monroe asserts that he was terminated for informing PFG—a third party client—of the drug use, not Capstone, and that "it is undisputed that Plaintiff did little to report these issues to Capstone," Defs.' Reply 28, ECF No. 25.

Illinois case law is clear that a suspected crime need not be reported to outside authorities for a discharge based on that report to violate public policy; an "internal safety complaint[]" is sufficient. *See Wheeler v. Caterpillar Tractor Co.*, 485 N.E.2d 372, 376–77 (Ill. 1985) ("We do not agree with the appellate court that the question whether the facts as alleged involved public policy, or a matter of private concern, depended upon whether a complaint was made to the regulatory authorities. The legislation and the regulations declared the public policy, and the existence of that public policy did not depend upon whether plaintiff had communicated a complaint to the [appropriate authority] . . . ."); *see also Johnson v. World Color Press, Inc.*, 498

N.E.2d 575, 578–79 (Ill. App. Ct. 1986) ("It does not matter that the plaintiff in the present case alleged that he only complained to his superiors and not to law enforcement officials."); *Petrik v. Monarch Printing Corp*., 444 N.E.2d 588, 592 (Ill. App. Ct. 1982) (finding that the plaintiff had stated a claim for retaliatory discharge by alleging that he was fired for reporting to management his suspicions that his employer was not complying with the Illinois Criminal Code because "it [was] apparent that [the employee's] complaint involve[d] something more than an ordinary internal dispute between an employee and his employer" and that "the public policy considerations that underlie *Palmateer* also support [the employee's] conduct").

Contrary to Capstone's assertions that Monroe "did little to report the[] issues to Capstone," Defs.' Reply 28, it is clear that Monroe *did* alert Klopp and Watson, both members of Capstone management, to his suspicions about Alfonso and Javier's illegal drug use and the corresponding safety concerns he had for the other warehouse workers. *See* Defs.' Mem. Supp. Mot. Summ. J. 5–6; Pl.'s Mem. Supp. Resistance Mot. Summ. J. 3. Capstone's Associate Handbook states that any associate who suspects another of drug use "must report it to their supervisor or the Human Resources Department," Associate Handbook 23, which, by informing Klopp, is exactly what Monroe did. To the extent that Capstone is arguing that Monroe's failure to follow its protocol for reporting drug use or elevate the issue to outside authorities defeats his retaliatory discharge claim, then, this argument fails. *See Wheeler*, 485 N.E.2d at 376–77. And the Court finds that the same public policy considerations that led the Illinois Supreme Court to declare that termination for reporting a suspected crime to outside authorities or to a supervisor violates a clear public policy mandate, *see Palmateer*, 421 N.E.2d at 879; *Wheeler*, 485 N.E.2d at 376–77, support a finding that a discharge resulting from Monroe's report to PFG of suspected drug use here would violate public policy. PFG was not a distant third party; rather, it operated

18

the warehouse at which Monroe worked, Defs.' Mem. Supp. Mot. Summ. J. 4; Pl.'s Mem. Supp. Resistance Mot. Summ. J. 2, and thus played a direct role in maintaining the safety of that warehouse. And Ortery was a supervisor at that facility. Monroe Dep. 79:6–8. Capstone's arguments do not persuade the Court that Monroe's report to PFG of his suspicions implicated only private interests. The Court finds that Monroe has satisfied the public policy element of Illinois' retaliatory discharge tort.

### ii. Causation

To survive summary judgment, Monroe must also provide the Court with evidence that would be sufficient for a jury to reasonably infer that he was terminated for reporting the suspected drug use to PFG. *See Reid*, 749 F.3d at 592. Such evidence may be direct or circumstantial; circumstantial evidence might include evidence of a "factual scenario[] that give[s] rise to a reasonable inference that the employer's motive was retaliatory." *See id.* at 587. The Court looks to the record as a whole to determine whether a jury could reasonably infer retaliation. *Id.*[13]

An employer can defeat a claim of retaliatory discharge by providing a valid nonpretextual reason for an employee's discharge. *See Gomez v. The Finishing Co., Inc.*, 861 N.E.2d 189, 197–98 (Ill. App. Ct. 2006). If the employer can point to a legitimate, nondiscriminatory reason for the termination, the employee then has the opportunity to show— by a preponderance of the evidence—that the employer's explanation is merely a pretext. *Id.* "A

---

[13] The Illinois Supreme Court has rejected as a method of proof for retaliatory discharge claims the *McDonnell Douglas* burden-shifting framework used by federal courts, finding that allowing the plaintiff to shift the burden to the defendant after establishing a *prima facie* case "would, in essence, expand the tort of retaliatory discharge by reducing [the] plaintiff's burden of proving the elements of the tort." *Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 407–08 (Ill. 1998) ("Because we refuse to expand the tort of retaliatory discharge, we decline plaintiff's invitation to adopt the three-tier allocation of proof method [set forth by *McDonnell Douglas*] in retaliatory discharge cases."). Accordingly, federal courts evaluating retaliatory discharge claims under Illinois law should not apply the *McDonnell Douglas* framework but should instead look to whether the plaintiff had put forth sufficient affirmative evidence of causation to survive summary judgment. *Reid*, 749 F.3d at 587.

plaintiff fulfills his burden of proof if he can show that the employer's explanation is not believable or raises a genuine issue of fact as to whether the employer discriminated against the plaintiff." *Id*. at 198.  If, at the summary judgment stage, a genuine dispute as to whether the employee's or the employer's explanation was the true reason for the termination exists, it is for the trier of fact to decide between the competing explanations.  *See Zuccolo v. Hannah Marine Corp*., 900 N.E.2d 353, 359 (Ill. App. Ct. 2008) (noting that "[t]he issue of an employer's true motive in terminating an employee is a question of fact, not normally subject to summary judgment"); *see also Clemons v. Mech. Devices Co*., 704 N.E.2d 403, 407 (Ill. 1998) ("If the trier of fact rejects [the] plaintiff's evidence, or instead accepts [the] defendant's proffered reason for the termination, then [the] plaintiff has failed to meet his burden of proof.").

Capstone argues that because it has provided a valid, nonpretextual reason for Monroe's termination, summary judgment is warranted on the retaliatory discharge claim.  *See* Defs.' Mem. Supp. Mot. Summ. J. 13.  It asserts that "the undisputed facts show that he was not discharged in retaliation for his alleged complaints to [PFG]" and that "Capstone terminated Monroe due to the altercation with and threats against . . . Alfonso." *Id*.  In support, it cites testimony from Cline and Elrod identifying the altercation with Alfonso and the corresponding threats as the reason for Monroe's discharge. *Id*. (citing Cline Dep. 42:15–21; *id*. at 61:20– 62:11; Elrod Dep. 37:5–12).  Monroe opposes summary judgment, arguing that "[i]t is a question of material fact as to whether the reason given [by Capstone] is truthful" and thus that it is for the jury to decide whether Capstone's explanation is mere pretext for a termination truly resulting from its displeasure over the drug use disclosure.  *See* Pl.'s Mem. Supp. Resistance Mot. Summ. J. 15–16.

To determine whether the retaliatory discharge claim should survive summary judgment, then, the Court analyzes whether there is sufficient evidence in the record to show that a reasonable jury could conclude that Capstone's proffered reason is "not believable," *Gomez*, 861 N.E.2d at 198, and that Monroe has identified the real reason for his termination—retaliation. The evidence indicates that both Cline and Elrod, along with Capstone's human resources department, participated in the decision to terminate Monroe. *See* Cline Dep. 83:11–18; Elrod Dep. 43:15–44:24 (further suggesting that Klopp had input into the decision).[14] Cline and Elrod both testified that Monroe was terminated because of the altercation with and threats made against Alfonso. Cline Dep. 25:8–14; *id*. at 62:1–20; Elrod Dep. 37:5–12. From their depositions, it is clear that they relied on Klopp's version of events to come to their decision. *See* Cline Dep. 24:24–25:23; *id*. at 26:24–27:8; *id*. at 39:19–41:6; Elrod Dep. 40:9–43:13; *id*. at 75:9–21. They primarily point to the January 24, 2019 email in which Klopp documented his account of the interaction between Monroe and Alfonso the previous day. Cline Dep. 25:15–23; *id*. at 39:19–41:6; Elrod Dep. 37:5–39:23; *id*. at 41:6–11 (noting that he was not aware of any other relevant documents from the HR department).[15]

The Court finds that there is sufficient evidence in the record to support a determination by a jury that the reason for the termination put forth by Capstone is not believable and that

---

[14] At various times in their depositions, both Cline and Elrod disclaim responsibility for making the formal decision to terminate Monroe. *See* Cline Dep. 80:24–81:15 (testifying that Elrod, not he, was the ultimate decision maker); Elrod Dep. 43:15–44:24 (testifying that he "was not the sole decision-maker" and that he "didn't make the call" to terminate Monroe). However, both acknowledge in their depositions that they took part in the termination decision. Cline Dep. 83:11–18 ("The chain of communication was quite simple. They reported the incident, the follow-up was given by John Klopp to me. I then communicated with Garrett Elrod the situation. It was decided on that phone call that if approved by human resource after we presented the information, then we would need to move forward with the termination due to the nature of the incident."); Elrod Dep. 43:15–44:24 (testifying that the decision to terminate "was a collective decision by all parties involved," including Klopp, Cline, and the HR coordinator, and that he was "looped in on what[ was] taking place" and "did not disagree, nor stop the decision from taking place").

[15] While Cline claimed in his deposition that he had a separate phone conversation with Klopp in which Klopp discussed what he had seen, he could not recall any specifics from that conversation. Cline Dep. 26:24–27:8.

Monroe was actually terminated because he reported suspected illegal drug use to PFG.  First,

the threat allegedly made against Alfonso by Monroe figures largely in Capstone's explanation

as to why it terminated Monroe, *see* Defs.' Mem. Supp. Mot. Summ J. 1, 13, but Klopp's

January 24, 2019 email—on which both Cline and Elrod relied, *see supra*—relates that Klopp

"d[id] not know . . . exactly what was said" between Monroe and Alfonso, and Klopp writes that

the threat Monroe allegedly uttered in Klopp's presence ("I've got stuff on [Alfonso] and I'll

take care of his ass.") was "not [a] direct quote," Klopp Jan. 24, 2019 Email.  Neither Cline nor

Elrod ever interviewed Monroe about what happened that day.  Cline Dep. 24:7–9; Elrod Dep.

38:19–21; *id*. at 41:22–42:4.  That the decisionmakers did no firsthand investigation but relied

entirely on Klopp's incomplete account of what happened to terminate an employee could

undermine Capstone's proffered reason in a jury's eyes.

     Second, emails discussing Monroe's termination that Cline sent to Elrod and other

members of Capstone management support the inference that Cline considered Monroe's

disclosure of suspected drug use to PFG a reason to terminate him.[16]  In an email written on

January 24, 2019 to Patrice Boyd, on which Elrod was copied, Cline wrote:

> With the sum factors of:
> 1. A verbal altercation with disturbance between the lead and his associate in a public space
> *2. Involving a partner in a [C]apstone associate accusation*
> 3. A perceived threat to the associate's well being [sic] from Gary while discussing the matter with the site manager
> 4. Causing a partner complaint against Capstone
> And following discussions with Garrett Elrod and yourself;

---

[16] As a preliminary matter, the Court notes that the January 24, 2019 email from Klopp also includes an account of a conversation Klopp had with Ortery and a PFG manager, in which they informed him that Monroe had told Ortery that he suspected that Alfonso was under the influence of marijuana while at work, Klopp Jan. 24, 2019 Email— Cline and Elrod were clearly aware that Monroe had shared his suspicions with PFG when they decided to fire him. *Cf. Roger v. Yellow Freight Sys., Inc*., 21 F.3d 146, 149–51 (7th Cir. 1994) (finding that summary judgment on a retaliatory discharge claim was proper where the employee offered no evidence that his employer was aware of his intent to file a worker's compensation claim and where a statement that the employee "would never work for [the employer] again" was made by a coworker who played no part in the decision to eliminate the employee's position).

> We are left with only one unfortunate option which is to proceed with a termination of Gary Monroe . . . .

Cline Jan. 24, 2019 Email, Defs.' Mot. Summ. J. Ex. 15, ECF No. 22-18 (emphasis added).  And

on January 27, 2019, Cline wrote to Elrod, Boyd, and a few other members of Capstone

management:

> The instance of a lead verbally antagonizing and causing a disturbance with a subordinate in a public area; then doubling down by issuing a perceived physical threat to the same associate's well-being to the Site Manager; *and further dragging the partner's leadership personnel into a Capstone HR situation, to which neither our site manager [n]or their staff could corroborate the assertion of a person being intoxicated* . . . [l]eft Capstone with little option but to terminate the lead.

Cline Jan. 27, 2019 Email, Defs.' Mot. Summ. J. Ex. 13, ECF No. 22-16 (emphasis added).  A

jury could infer from Cline's statements in these emails that Monroe's disclosure to PFG

prompted Capstone to terminate Monroe.  And the fact that the drug use disclosure is specifically

mentioned in these emails could persuade a jury to find Capstone's current argument that it

discharged Monroe *only* because of the threats allegedly made to Alfonso and not because of

Monroe's conversation with PFG, Defs.' Mem. Supp. Mot. Summ. J. 13, less than credible.

Finally, Monroe testified that Cline specifically brought up his report to PFG in his

termination meeting.  In his deposition, Monroe stated:

> I asked him, what is this about, and [Cline] was brief.  He goes that you violated policy by sharing information with the partner, and that you had a verbal altercation with Alfonso.  And I told him that there was no verbal altercation.  I said there are witnesses to what was being said.  And I said that the sharing of the partner—he cut me off and he goes, I don't want to hear about it.  He goes, This is the position that Capstone has taken.

Monroe Dep. 129:9–17[17]; *see also id*. at 90:2–6 ("And then [Cline] goes, Sit down.  He goes—all he said to me was, You violated policy by sharing information with the partner, and I can't go on no more about it. And that was it.").  This evidence could support an inference that Monroe was terminated because he informed PFG about the suspected drug use.

Based on the Court's review of the record, it concludes that a jury could reasonably find that Capstone's asserted reason for the termination was pretextual and that the actual cause of Monroe's discharge was that he reported his suspicions of illegal drug use to PFG.  *See Siekierka v. United Steel Deck, Inc.*, 868 N.E.2d 374, 381 (Ill. App. Ct. 2007) (finding that summary judgment should have been denied because both the employee and the employer presented sufficient evidence to support an inference that either of their proffered reasons for the termination could have been true).  Accordingly, the Court denies Capstone's Motion for Summary Judgment as to Monroe's claim of retaliatory discharge.

## CONCLUSION

For the foregoing reasons, Defendants Capstone Logistics, LLC and LMS Intellibound, Inc. n/k/a LMS Intellibound, LLC's (collectively, "Capstone") Motion for Summary Judgment, ECF No. 22, is GRANTED IN PART and DENIED IN PART.  The Court finds that Capstone is entitled to summary judgment on Plaintiff Gary T. Monroe's race discrimination claim.  Summary judgment is denied as to Monroe's retaliatory discharge claim.  This case is set for a final pretrial conference on September 1, 2021 at 10:00 AM.  The proposed pretrial order is due by August 25, 2021.

---

[17] Capstone argues that this is inadmissible hearsay.  Defs.' Reply 9.  A statement offered against an opposing party that "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay.  Fed. R. Evid. 801(d)(2)(D).

Entered this 20th day of August, 2021.

s/ Sara Darrow
_____
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE
